NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0696n.06

Nos. 19-4074/4075

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

**FILED**
Dec 15, 2020
DEBORAH S. HUNT, Clerk

| | |
|---|---|
| In Re: DEPUY ORTHOPAEDICS, INC. ASR HIP IMPLANT PRODUCTS LIABILITY LITIGATION. | ) ) ) |
| _____ | ) |
| **19-4074** | ) ) |
| ANDREA K. DRAKE; WILLIAM S. DRAKE, | ) ) |
| Plaintiffs-Appellees, | ) |
| v. | ) ) |
| DEPUY ORTHOPAEDICS, INC., et. al., | ) ) |
| Defendants, | ) ) |
| STEVEN M. JOHNSON, d/b/a THE JOHNSON LAW FIRM, | ) ) ) |
| Petitioner-Appellant. | ) ) |
| **19-4075** | ) ) |
| STEVEN M. JOHNSON, | ) ) |
| Petitioner-Appellant, | ) ) |
| v. | ) |
| WILLIAM S. DRAKE, | ) ) |
| Respondent-Appellee. | ) ) |

On Appeal from the United States District Court for the Northern District of Ohio

**Before: GUY, CLAY, and KETHLEDGE, Circuit Judges.**

**RALPH B. GUY, JR., Circuit Judge.** These appeals involve the arbitration of a contingent fee dispute between an attorney and his former client after the client obtained a

settlement of his underlying claims through the DePuy ASR Hip Implant Products Liability Litigation (MDL No. 2197). Attorney Steven M. Johnson d/b/a The Johnson Law Firm, initiated arbitration in Texas against his former client William Drake pursuant to their Attorney Representation Agreement (ARA), which ultimately resulted in a final arbitration award in Johnson's favor for more than $350,000. Moving to vacate that award, Drake sought to force Johnson to arbitrate their fee dispute anew before a Special Master appointed under the MDL's Master Settlement Agreement (MSA). The district court sided with Drake twice—once before and once after we dismissed Johnson's first appeal for lack of jurisdiction. *Drake v. DePuy Orthopaedics, Inc.*, 757 F. App'x 449, 452 (6th Cir. 2018).

Johnson's latest appeals are from the district court's orders on remand: (1) denying confirmation of the arbitration award in Johnson's favor; (2) vacating that arbitration award; and (3) ordering the parties to arbitrate their fee dispute again pursuant to the MSA. *Drake v. DePuy Orthopaedics, Inc.*, No. 1:13-dp-20140, 2019 WL 4750608 (N.D. Ohio Sept. 30, 2019) (MDL); *Johnson v. Drake*, No. 1:17-dp-20085 (Order R. 54) (N.D. Ohio Sept. 30, 2019) (Transferred Motion to Confirm Award). To be clear, the issue is not *whether* the parties agreed to arbitrate any fee disputes between them under the express terms of the ARA—everyone accepts that they did. The question is whether it was error to vacate the arbitration award on the grounds that the initial agreement to arbitrate was amended, modified, or otherwise superseded by the provisions of the MSA. Because the district court's reliance on a mix of contract principles, estoppel theory, and inherent authority does not withstand scrutiny, we **REVERSE** and **REMAND** for further proceedings consistent with this opinion.[1]

---

[1] Although judgment has not been entered in the Drakes' MDL case under 28 U.S.C. § 1291, an appeal may be taken from orders "denying confirmation of an award" or "vacating an award," 9

I.

Minnesota resident William Drake underwent bilateral hip replacement surgeries in 2007. The implants he received—DePuy Articular Surface Replacement (ASR) hip devices—were recalled in 2010. Many lawsuits followed and, by the end of 2010, the Judicial Panel on Multidistrict Litigation had ordered the transfer of the first of thousands of federal ASR hip implant actions to the Northern District of Ohio for coordinated or consolidated pretrial proceedings. *See* 28 U.S.C. § 1407(a) (providing that each action "be remanded by the panel at or before the conclusion of such pretrial proceedings to the district from which it was transferred unless it shall have been previously terminated").

## A. Johnson's Representation

Drake's wife Andrea saw and responded to a solicitation from the Johnson Law Firm relating to the DePuy recall. Letters and calls were directed to the Drakes for more than a year, until a final warning letter prompted Drake to engage Johnson to represent him in January 2012. Under the Attorney Representation Agreement (ARA or Fee Agreement), Johnson would bring Drake's claims against the manufacturer and distributor of the ASR hip device and would receive a contingent attorney's fee of 40% of whatever was recovered "by way of settlement, judgment, or otherwise." The ARA specified that it would be governed by Texas law, contained an integration clause, and was silent regarding subsequent amendment or modification.

Significant for our purposes, Drake expressly agreed to "binding arbitration of any disputes between the client and the Firm." More specifically, Drake and Johnson agreed that "any dispute arising from the interpretation, performance, or breach of this Fee Agreement . . . shall be resolved

---

U.S.C. § 16(a)(1)(D)-(E). Also, judgment was entered in the action transferred from the district court in Texas, and an appeal may be taken from "a final decision with respect to an arbitration that is subject to this title." 9 U.S.C. § 16(a)(3).

by final and binding arbitration conducted in Fort Worth, by any other arbitrator that The Firm may choose." The ARA did not otherwise specify the arbitrator or incorporate any arbitration rules to govern such an arbitration.

Johnson represented Drake for less than a year. In that time, Johnson notified DePuy of Drake's ASR-related claims, obtained medical records, and waited for Drake's revision surgery to be scheduled. At the end of November 2012, the Firm was advised that Drake was terminating its representation; Johnson filed a "short form" complaint in the MDL on Drake's behalf anyway; and Drake retained as substitute counsel Minnesota Attorney Charles Johnson (no relation to Steven Johnson). Although the sequence of and justifications for those actions were contested in the Texas arbitration proceeding, the fact that they occurred was not.[2]

Not long after terminating Johnson's representation, Drake underwent revision surgery and changed counsel one last time. The Drakes have been represented ever since by the Minnesota law firm of Meshbesher & Spence, Ltd.—both in the MDL case and the fee dispute with Johnson.

### B. Drake's Settlement

A new complaint alleging the Drakes' ASR-related claims was filed in federal court in Minnesota in early 2013. That became the operative pleading after it was transferred to the Northern District of Ohio for pretrial proceedings in the DePuy ASR Hip Implant Products Liability Litigation. *See Gelboim v. Bank of Am. Corp.*, 574 U.S. 405, 413 (2015) (noting that "[c]ases consolidated for MDL pretrial proceedings ordinarily retain their separate identities"). That transfer called attention to the "short-form" complaint previously filed by Johnson on Drake's

---

[2] The arbitrator ultimately found that Drake did *not* have "good cause" to fire Johnson, which, under Texas law, meant that Johnson was not limited to a *quantum meruit* recovery and was able to enforce the contract and collect the full contingent fee once Drake recovered on the underlying claim. *See Mandell & Wright v. Thomas*, 441 S.W.2d 841 (Tex. 1969).

behalf. Johnson stipulated to its dismissal, but not without asserting a contingent fee claim "for the full amount of all monies that JLF is entitled to under the terms of its contract with the Plaintiff and that this dismissal shall have no effect on those claims."

The MDL proceeded with extensive discovery conducted by lead counsel for plaintiffs and defendants, and, by mid-2013, the number of cases filed in the MDL docket exceeded 8,500. *Drake v. DePuy Orthopaedics, Inc.*, No. 13-dp-20140, 2017 WL 6502489, at *1 (N.D. Ohio Dec. 19, 2017). DePuy and a committee of plaintiffs' attorneys (which did not include Johnson) reached a private global settlement agreement in late 2013. The settlement—formalized as the Master Settlement Agreement (MSA)—created an "opt-in" program funded by DePuy for the settlement of the ASR-related claims, filed and unfiled, of eligible U.S. claimants who underwent revision surgery prior to August 31, 2013. Under the MSA, eligible claimants (including Drake) could choose to settle by "enrolling" in the program and agreeing to have their claims decided in a private administrative process with the release of all claims against the defendants.

In particular, the MSA appointed three Special Masters "to oversee the administration of claims for benefits and to make final and binding determinations under this Agreement with the authority of an Arbitrator under the Federal Arbitration Act." (MSA § 12.4.2.) The MSA provided for "final, binding and Non-Appealable" arbitration of "any dispute that arises under or otherwise in connection with . . . any U.S. Program Claim." (MSA § 14.1.2.) An arbitration would be initiated by serving a demand on the Special Master, and, unless the parties agreed otherwise, the arbitration would be governed by the American Arbitration Association (AAA)'s Commercial Arbitration Rules. (MSA § 14.1.3.2.)

Through counsel, the Drakes enrolled in the MSA's settlement program in early 2014. Drake was approved for Part A and Part B settlement awards totaling $561,750, which triggered

Johnson's contingent fee claim. Drake also filed a claim under the MSA's Extraordinary Injury Fund (EIF), although it is not clear whether that claim is still pending. The Drakes re-enrolled after the MSA was modified and extended to cover U.S. claimants who had revision surgery prior to January 31, 2015. For our purposes, the relevant provisions of the 2013 MSA remained unchanged in the 2015 MSA.[3]

### C. Arbitration of the Contingent Fee Claims

Drake's counsel proposed that the fee dispute be arbitrated before a Special Master under the MSA. Instead, Johnson initiated an arbitration with JAMS in Dallas, Texas. Johnson also filed a motion to compel arbitration, which was dismissed for lack of personal jurisdiction by the federal court in Texas. The JAMS arbitration proceeded over Drake's objections, and the arbitrator was selected. The arbitration hearing was delayed for settlement discussions, but a settlement was never finalized.

So, in early 2016, Drake formally invoked the MSA's arbitration process and a JAMS arbitration was referred to Special Master Cathy Yanni. Johnson objected to the arbitration on several grounds and also filed (and later dismissed) a second motion to compel arbitration in federal court in Texas. That detour did not last long, however, because Special Master Yanni quickly dismissed the arbitration for lack of jurisdiction. Johnson contends that the dismissal should be understood as an implicit determination that the dispute was not arbitrable under the MSA, although the brief order did not say that. Instead, the order stated that the Special Master had been "unaware and not informed of the arbitration already proceeding before Judge Ashworth" in the Dallas JAMS proceeding. The only reasons given are at least as likely to imply that the

---

[3] The district court noted that the MSAs and other forms are available on the website for the U.S. ASR Hip Settlement. *Drake*, 2017 WL 6502489, at * 6 (citing www.usasrhipsettlement.com).

dismissal was based on deference to the first-filed and still pending Dallas JAMS proceeding. *See Drake*, 757 F. App'x at 452 (describing this dismissal as based on lack of "jurisdiction over the matter because it was already pending in a different forum with another JAMS arbitrator").

The arbitration hearing was finally conducted in the Dallas JAMS proceeding. The arbitrator issued a final corrected arbitration award in Johnson's favor in July 2016. The arbitrator's written decision rejected Drake's defenses and counterclaims—including his claim of fraudulent inducement, his defense that the ARA was terminated for "good cause," and his challenges to the contingent fee on the grounds of forfeiture and unconscionability. After finding that Drake had breached the contract, Johnson was awarded: (1) a net contingency fee of 35% of the Part A and Part B settlement awards in the amount of $196,612.50 (as well as on any future EIF recovery); (2) a lien against Drake's recovery to the extent of that fee; and (3) contract damages for the attorney's fees and costs incurred in the arbitration in the amount of $136,457 and $20,145.47, respectively. Altogether, Johnson was awarded $353,214.97. That did not end the matter.

## D. Federal Court Proceedings

Johnson filed a new action for confirmation of the award in the Texas federal court, while the Drakes countered with a motion filed in the Ohio MDL to vacate the arbitration award and enforce the MSA. The Texas action was later transferred to Ohio to be decided with the MDL proceedings. The Ohio district court decided to order the parties to arbitrate the fee dispute again under the MSA. *See Drake*, 2017 WL 6502489, at *9. Johnson appealed, but this court remanded with instructions for the district court to also decide the competing motions to confirm or vacate the arbitration award. *Drake*, 757 F. App'x at 454. On remand, the district court vacated the arbitration award because the arbitration "did not comport with the parties' agreement" and

ordered the parties "to adhere to the arbitration procedures set forth in the 2015 [Master] Settlement Agreement." *Drake*, 2019 WL 4750608, at * 4. This appeal followed.

## II.

The Federal Arbitration Act restricts judicial review of an arbitration award to the statutory grounds for vacating, modifying, or correcting an award under 9 U.S.C. §§ 10-11. *See Hall Street Assoc., LLC v. Mattel, Inc.*, 552 U.S. 576, 584 (2008). Drake abandoned his argument for vacatur based on partiality, 9 U.S.C. § 10(a)(2), but the FAA did not prevent Drake from otherwise challenging the validity of the agreement to arbitrate the fee dispute after the award. *See PolyOne Corp. v. Westlake Vinyls, Inc.*, 937 F.3d 692, 698 (6th Cir. 2019). Such a challenge could be foreclosed by waiver if the party consented to the arbitration, but the district court found no waiver here because the record was "replete with Drake's assertions that the MDL is the proper forum for resolution of any fee dispute." *Drake*, 2017 WL 6502489, at *8. Johnson does not contest that finding, so we assume that waiver does not apply here.

### A. Arbitrability

Arbitration agreements are placed "on equal footing with all other contracts," *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006), and must be enforced "according to their terms," *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 67 (2010). This also means that "parties may agree to have an arbitrator decide not only the merits of a particular dispute but also "'gateway" questions of "arbitrability," such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy.'" *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529 (2019) (quoting *Rent-A-Center*, 561 U.S. at 68-69). An agreement to arbitrate questions of arbitrability may not be disregarded, but such a delegation requires "clear and unmistakable" evidence that the parties agreed to have the arbitrator decide those issues. *In*

*re Automotive Parts Antitrust Litigation*, 951 F.3d 377, 382 (6th Cir. 2020) (quoting *Rent-A-Center*, 561 U.S. at 69 n.1).

As alluded to earlier, Johnson contends that the Special Master's dismissal of the second JAMS proceeding was a binding determination that the fee dispute was *not* arbitrable under the MSA. Assuming that the parties agreed to have JAMS Rules govern that arbitration, the Special Master would have been delegated the authority "to determine jurisdiction and arbitrability issues as a preliminary matter." JAMS Rule 11(b). (No. 17-dp-20085, Page ID # 549.) Otherwise, the MSA's incorporation of the AAA's Commercial Arbitration Rules could provide "clear and unmistakable" evidence of an agreement to arbitrate questions of arbitrability. *See Blanton v. Domino's Pizza Franchising LLC*, 962 F.3d 842, 845-46 (6th Cir. 2020) (discussing incorporation of AAA rules which provide that the arbitrator has "the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement").[4]

But, regardless of what may be implied from the Special Master's order of dismissal, "arbitrators derive their authority to resolve disputes only because the parties have agreed in advance to submit such grievances to arbitration." *In re Automotive Parts*, 951 F.3d at 382 (quoting *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986)). As a result, even when issues of arbitrability have been committed to an arbitrator, courts must first decide any disagreement concerning "the formation of the parties' arbitration agreement." *Id*. at 383 (quoting *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 298 (2010)). Indeed, this court has

---

[4] The same cannot be said for the ARA, which did not incorporate similar rules to govern any arbitration. Nor does the ARA's provision for arbitration of any dispute arising from the "interpretation, performance, or breach of this Fee Agreement" provide comparably "clear and unmistakable" evidence that the parties agreed to have the arbitrator decide questions of arbitrability.

expressly refused "to merge challenges to the validity of an agreement ('whether it is legally binding') with challenges to the existence of an agreement in the first instance ('whether it was in fact agreed to' or 'was ever concluded')." *Id*. at 385 (citations omitted); *see also Blanton*, 962 F.3d at 848-49 (explaining that the court must decide a non-signatory's challenge to the existence of an agreement to arbitrate even if the agreement incorporates the AAA Rules).

## B.  Agreement to Arbitrate

The starting place then is the existence of an arbitration agreement between the parties. *See Taylor v. Pilot Corp.*, 955 F.3d 572, 576 (6th Cir. 2020).  State law governs the formation of contracts, even though federal law determines whether the parties agreed to arbitrate questions of arbitrability.  *Blanton*, 962 F.3d at 846-47.  The district court's decisions regarding the existence of a valid arbitration agreement are reviewed *de novo*.  *In re Automotive Parts*, 951 F.3d at 381.

The glaringly undisputed fact is that Johnson and Drake expressly agreed in the 2012 ARA that "any dispute arising from the interpretation, performance, or breach of this Fee Agreement . . . shall be resolved by final and binding arbitration conducted in Fort Worth, by any other arbitrator that The Firm may choose."  The district court concluded, however, that this was no longer the operative agreement because the parties had agreed to arbitrate their disputes under the provisions of the MSA.  The district court's analysis rests on a mixture of contract principles, estoppel theory, and its inherent authority to manage complex litigation.  *Drake*, 2019 WL 4750608, at \*3-4.  We address each in turn.

### 1.  Contract Principles

The district court began with the unremarkable observation that Texas law recognizes that parties may "amend their written arbitration agreement through a subsequent writing."  *Drake*, 2019 WL 4750608, at \*3 (citing *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 227-28 (Tex.

2003)).  Here, however, there is no subsequent writing between the parties agreeing to amend or modify the arbitration provisions in the ARA.  Instead, the district court concluded that Drake and Johnson both "became subject to" the 2015 MSA (which extended the 2013 MSA) and, therefore, they had "agreed to a contract which contained a binding arbitration provision."  *Id*. at *3 and *4.  That is not the same as an agreement between them to arbitrate their contingent fee disputes before a Special Master pursuant to the MSA—rather than before an arbitrator of the Firm's choosing in Texas.  A closer look at the MSA is necessary.

Recall that the MSA is an agreement to establish a private settlement program, to which an eligible U.S. Claimant may "opt in."  Neither Drake nor Johnson are "parties" to the MSA itself— it is an agreement between DePuy and a committee of plaintiffs' attorneys (that did not include Johnson).  The Drakes argue that the fee dispute with Johnson is arbitrable under the MSA, which provides for arbitration of "any dispute that arises under or otherwise in connection with . . . any U.S. Program Claim."  (MSA § 14.1.2.)  But the Drakes are wrong to suggest that this definition of *what* disputes are arbitrable is an answer to the distinct question of *who* has agreed to arbitrate such disputes.  *See, e.g.*, *In re Automotive Parts*, 951 F.3d at 385.

The MSA actually sheds light on *who* agreed to submit such disputes to arbitration in the preceding subsection:  "Each Party, and by submitting an Enrollment Form and Release, each Enrolling U.S. Program Claimant and Enrolling Counsel, agrees that authority over the process . . . resides with those Persons appointed pursuant to this Agreement to exercise that authority in making the determinations with respect to claims submitted to the U.S. Program to do so with the authority of Arbitrators under the Federal Arbitration Act."  (MSA § 14.1.1.)  In other words, it is the enrollment that operates as consent to the dispute resolution process with respect to that enrolled U.S. Program claim.  As an enrolling claimant, Drake certainly consented to the

arbitration process for any dispute arising under or in connection with *his* U.S. Program claim. While Johnson enrolled *other* claimants in the settlement program and would be bound to arbitrate disputes arising under or in connection with *those* U.S. Program claims, Johnson was not Drake's enrolling counsel (and did not represent him at any time after the MSA was approved). Although Johnson was *an* enrolling counsel for *other* U.S. Program claimants, that did not contractually bind Johnson to arbitrate disputes vis a vis Drake's U.S. Program claim.

Nor does the district court's passing citation to *Branch Law Firm LLP v. Osborn*, 532 S.W.3d 13-18 (Tex. App. 2016), support a contrary conclusion. Unlike here, the MSA in that case settled all of the Avandia claims belonging to clients of the "Participating Law Firms"; was signed by Turner Branch, as a member of the Lead Participating Law Firm, on behalf of all "Participating Law Firms"; and expressly bound "Each Participating Law Firm, including all its current and future attorney members of or affiliated with each firm," to the terms and conditions of the MSA. *Id*. at 15 and 16. Those terms included an express agreement to arbitrate disputes, including those "between or among Participating Law Firms and/or members of Participating Law Firms arising out of or in connection with this Agreement." *Id*. at 16. Because Osborn was an attorney employed as an associate of a Participating Law Firm, he was contractually bound under agency principles to the terms and conditions of the MSA—including the arbitration provision. *Id.* at 18.

Section 14.1 of the MSA does not establish that Johnson and Drake amended their prior agreement to arbitrate any fee disputes under the ARA. Nor have the Drakes identified any other contractual basis that would bind Johnson to arbitrate his contingent fee claims under the MSA.

### 2. Direct Benefits Estoppel

The district court also invoked the doctrine of "direct benefits estoppel," which is a type of equitable estoppel that applies in the arbitration context. *See In re Kellogg Brown & Root, Inc.*,

166 S.W.3d 732, 739 (Tx. 2005). "In the archetypal direct-benefits case, the party opposing arbitration seeks to enforce the terms of an agreement with an arbitration clause." *Jody James Farms, JV v. Altman Group, Inc.*, 547 S.W.3d 624, 637 (Tx. 2018). But Johnson sought to enforce the terms of the Fee Agreement—not the MSA.

"A person who has not agreed to arbitrate may nevertheless be compelled to do so when the person 'seeks, through the claim, to derive a direct benefit from the contract containing the arbitration provision.'" *In re Morgan Stanley & Co., Inc.*, 293 S.W.3d 182, 184 n.2 (Tx. 2009) (quoting *In re Kellogg Brown & Root*, 166 S.W.3d at 741). The district court pointed out that Johnson's fee claims are "dependent upon a recovery by the Drakes," which, in turn, is "squarely based upon the Master Settlement Agreement." *Drake*, 2019 WL 4750608, at *3. Even so, Johnson's contingent fee claims did not seek to enforce any terms of the MSA against Drake.

The district court also relied on the fact that Johnson had represented numerous *other* plaintiffs who settled *their* ASR-related claims "pursuant to one or more of the ASR Settlement Agreements." *Id*. at *4. The fact that he represented *other* plaintiffs in *other* MDL cases is not a direct benefit for purposes of this estoppel doctrine. And, to the extent that Johnson's contingent fee claim may have derived indirect benefits from the MSA, the MSA required a "holdback" of 5% of attorney's fees from the settlement award for the common benefit fund. (MSA § 4.1.8.)

### 3. Inherent Authority

The district court also made passing reference to the "MDL court's 'inherent authority' to create and enforce mechanisms which 'bring management power to bear upon massive and complex litigation.'" *Drake*, 2019 WL 4750608, at *3 (quoting *In re Vioxx Prods. Liability Litigation*, 760 F. Supp. 2d 640, 648 (E.D. La. 2010)). The mechanism adopted in *In re Vioxx* involved the MDL court's assessment of common benefit attorney's fees to compensate the lead

counsel's work in the MDL.  The MSA in this case employed a similar common benefit fund mechanism, but that was not challenged by the competing motions to confirm or vacate the arbitration award.

"[A]n MDL court has broad discretion to create efficiencies and avoid duplication—of both effort and expenditure—across cases within the MDL." *In re Nat'l Prescription Opiate Litigation*, 956 F.3d 838, 841 (6th Cir. 2020).  The coordination of effort in the MDL here illustrates the advantages that MDL litigation can offer.  "But the law governs an MDL court's decisions just as it does a court's decisions in any other case."  *Id*. at 844.  For example, because § 1407 only authorizes transfers for pretrial proceedings, the Supreme Court held that an MDL court could not transfer such a case to itself for trial under 28 U.S.C. § 1404.  *See Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 40 (1998).

The district court's power to compel arbitration under the MSA is no greater in the MDL context than in any other case.  Substantive law dictates that "no matter how strong the federal policy favors arbitration, arbitration is a matter of contract between the parties, and one cannot be required to submit to arbitration a dispute which it has not agreed to submit to arbitration." *In re Automotive Parts*, 951 F.3d at 383 (citation omitted).  It was error in this case to find that the parties' express agreement to arbitrate under the ARA was subsequently amended, modified, or otherwise superseded by the arbitration provisions of the MSA.

*                    *                    *

The district court's orders denying confirmation and vacating the arbitration award in Johnson's favor are **REVERSED** and the cases are **REMANDED** for further proceedings consistent with this opinion.

**CLAY, Circuit Judge, dissenting.** This appeal raises the rather unusual question of how a dispute is to be arbitrated, rather than the more commonplace issue of arbitrability per se. The parties agree that an arbitrator must decide to what extent, if any, an attorney is entitled to a fee contingent on his former client's settlement in a multi-district litigation ("MDL"). However, for over six years, in four federal cases and two arbitrations, as well as for the second time before this Court, that attorney and the client who terminated him in 2012 have vigorously litigated whether the applicable arbitration procedures are determined by reference to their bilateral Attorney Representation Agreement ("ARA") or a Master Settlement Agreement ("MSA") reached in the MDL.1 The district court did not err in concluding that the attorney consented to arbitrate disputes under the MSA or that his claim for a contingent fee was encompassed by that agreement. The majority holds otherwise and concludes that, because the attorney did not represent his former clients when they entered into the MSA, he did not consent to arbitrate this dispute under it. Because that reasoning contravenes the explicit terms of the MSA, I respectfully dissent.

**I.      Background**

William S. Drake and his wife Andrea K. Drake ("the Drakes") retained attorney Steven M. Johnson to represent them in claims relating to William's articular surface replacement ("ASR") hip implant.2 William underwent his hip replacement in or before 2008. The manufacturer, DePuy Orthopaedics, recalled the ASR hip in 2010 due to widespread failures of

---

[1] All references to the MSA are to the 2015 MSA, rather than the 2013 version, which the majority recognizes is unchanged for the issues relevant to this appeal. Citations are to the complete copy available at the website indicated by the district court, www.usasrhipsettlement.com. *Drake v. DePuy Orthopaedics, Inc.* ("*Drake* I"), Case No. 1:13-dp-20140-JJH, 2017 WL 6502489, at *6 (N.D. Ohio Dec. 19, 2017).

[2] While it appears that only William was a party to the ARA, William and Andrea are referred to collectively in the district court's order, and that practice is followed here.

the device. Numerous suits followed, and the Judicial Panel on Multidistrict Litigation centralized

the actions involving the recalled devices in the Northern District of Ohio.

Johnson was hired by the Drakes in January 2012 pursuant to an Attorney Representation

Agreement. The engagement was limited to claims relating to the DePuy ASR hip device and

provided that Johnson would be compensated by a 40% contingent fee, exclusively out of a share

of the recovery, if any, "by way of settlement, judgment or otherwise . . . ." (ARA, R. 10-4, Page

ID #267.) 3 Johnson was granted a lien on the ASR cause of action, and the parties agreed that

"any dispute arising from the interpretation, performance, or breach of the" ARA "shall be resolved

by final and binding arbitration conducted in Fort Worth, by any other arbitrator that The Firm

may choose." (*Id.*) The ARA was signed after approximately fifty-seven calls and letters to the

Drakes over nearly sixteen months by Johnson's law firm. The last communication sent by Johnson

stated "[f]ailing to contact us may result in the closing of your file and the loss of your rights."

(Corr. Final Award, R. 10-3, Page ID #252.)

Less than a year later, the Drakes terminated Johnson's representation and retained other

counsel. On November 28, 2012, Andrea called Johnson's law firm to express some doubts about

maintaining their representation and explain that the Drakes might hire another lawyer. On

November 30, 2012, Johnson filed a document captioned as a "Short Form Complaint for DePuy

Orthopaedics, Inc. ASR Hip Implant Products Liability Litigation," in the Northern District of

Ohio. That same day, Johnson was notified that the Drakes had hired another attorney to represent

them in connection with ASR hip claims. Johnson responded to the Drakes' new counsel by giving

notice of a claimed lien of 40% of any amount recovered in the DePuy suit. The Drakes'

subsequent counsel filed an ASR hip case against DePuy and related entities on January 24, 2013.

---

3 Citations to the district court record ("R.") refer to Case No. 1:13-dp-20140-JJH (N.D. Ohio).

The case was transferred to the Northern District of Ohio for MDL consolidated proceedings. The action initiated by Johnson on the Drakes' behalf was dismissed pursuant to stipulation on June 26, 2013. The parties "recognize[d] that the Johnson Law firm [*sic*] has asserted a claim on any recovery [the Drakes] may make for any injuries related to the DePuy ASR for the full amount of all monies that JLF is entitled to under the terms of its contract with [the Drakes] and that this dismissal shall have no effect on those claims." (Stipulation of Dismissal, R. 11-2, Page ID #361.)

A global settlement was reached between DePuy and a committee of plaintiffs' attorneys in November 2013. *Drake v. DePuy Orthopaedics, Inc.* ("*Drake* II"), 757 F. App'x 449, 451 (6th Cir. 2018). The Drakes joined this settlement shortly thereafter. *Id.* They settled a portion of their suit against DePuy for $561,750, and an Extraordinary Injury Fund claim is still possibly outstanding. *Id.* at 452 n.7.

As early as June 30, 2014, the Drakes' current counsel proposed to resolve the dispute over Johnson's contingent fee claim according to the arbitration procedures provided in the MSA. Johnson refused. Instead, on July 13, 2014, he initiated an arbitration with JAMS, a private alternative dispute resolution provider, in Dallas pursuant to the ARA ("Dallas arbitration"), and the next day filed a suit to compel arbitration in the Northern District of Texas. The federal suit was dismissed for lack of personal jurisdiction on November 25, 2014. In early 2016, the Drakes initiated an arbitration pursuant to the terms of the MDL MSA with Special Master Cathy Yanni. Special Master Yanni was a member of JAMS, like the Dallas arbitrator, and dismissed the matter upon being informed of the ongoing JAMS proceeding on March 9, 2016.[4] Shortly thereafter,

---

[4] Johnson argues that implicit in Special Master Yanni's dismissal is a binding determination that that his claims do not come within the scope of the MSA. However, Special Master Yanni's order makes no reference to the MSA, and instead appears to base the jurisdictional determination entirely on the fact that another JAMS arbitration, the Dallas arbitration, was already proceeding. *See Drake* II, 757 F. App'x at 452.

Johnson dismissed another suit to compel arbitration that he had filed in the Northern District of Texas.

On June 22, 2016, the Dallas arbitrator found in favor of Johnson and awarded him a net 35% contingency fee from the Drakes' DePuy settlement awards in the amount of $196,612.50, 35% of any future recovery, a lien on recovered claims, attorney fees in the amount of $136,457, and arbitration costs in the amount of $20,145.47. The same day, the Drakes filed a motion in the Northern District of Ohio to enforce the MSA and vacate the award. On July 7, 2016, Johnson filed another suit in the Northern District of Texas, this time to confirm the arbitration award. On December 20, 2017, the district court for the Northern District of Texas transferred Johnson's latest case to the Northern District of Ohio for possible consolidation with the Drakes' pending suit.

Just the day prior, on December 19, 2017, the district court had granted the Drakes' motion to enforce the MSA and had declined to address their motion to vacate the arbitration award. *Drake* I, 2017 WL 6502489, at *9. Johnson appealed that decision, but we found we lacked jurisdiction because there was no final order under 28 U.S.C. § 1291 or an interlocutory order appealable under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 16(a)(1)(E). *Drake* II, 757 F. App'x at 452–53. We directed the district court to consider Johnson's application to confirm the arbitration award and the Drakes' motion to vacate the same. *Id.* at 453–54.

In a December 30, 2019 memorandum opinion and order the district court denied Johnson's motion to confirm the Dallas arbitration award, granted the Drakes' motion to vacate the same, and directed the parties to pursue arbitration pursuant to the MSA. *Drake v. DePuy Orthopaedics, Inc.* ("*Drake* III"), Case No. 1:13-dp-20140-JJH, 2019 WL 4750608, at *4 (N.D. Ohio Sept. 30, 2019). Johnson timely appealed.

## II.      Discussion

This Court reviews findings of fact for clear error and questions of law de novo in appeals of district court decisions either vacating or confirming an arbitrator's award under the FAA. *Samaan v. Gen. Dynamics Land Sys., Inc.*, 835 F.3d 593, 599 (6th Cir. 2016). A district court must issue an order confirming an arbitrator's award "unless the award is vacated, modified, or corrected as prescribed in [9 U.S.C. §§] 10 and 11 . . . ." 9 U.S.C. § 9. Section 10 provides the exclusive grounds for vacatur under the FAA. *See Hall Street Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 584 (2008). As the majority recognizes, the Drakes have abandoned their argument for vacatur on the basis of partiality under § 10(a)(2). Since there is no allegation of fraud, § 10(a)(1), or arbitrator misconduct, § 10(a)(3), the award in this case may be vacated only if "the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." 9 U.S.C. § 10(a)(4).

As the Supreme Court has recognized, "the first principle that underscores all of our arbitration decisions [is that a]rbitration is strictly a matter of consent, and thus is a way to resolve those disputes—*but only those disputes*—that the parties have agreed to submit to arbitration." *Granite Rock Co. v. Int'l Brotherhood of Teamsters*, 561 U.S. 287, 299 (2010) (internal quotation marks and citations omitted). As the majority correctly recognizes, neither the Drakes nor Johnson were signatories to the MSA itself—it was an agreement between DePuy and a committee of plaintiffs' attorneys of which Johnson was not a member.[5] However, the MSA also provides that certain other parties may agree to submit disputes to arbitration as delineated in that agreement. The relevant provision provides:

> Each Party [i.e., DePuy and plaintiffs' counsel committee] and, by submitting an
> Enrollment Form and Release, each Enrolling U.S. Program Claimant and

---

[5] Johnson had applied to the district court for an appointment to the committee.

> Enrolling Counsel, agrees that authority over the process contemplated by the U.S. Program, including any Claims submitted under the U.S. Program, resides with those Persons appointed pursuant to this Agreement to exercise that authority, as such authority is specified in this Agreement and that the Claims Administrator, Claims Processor and Special Masters in making the determinations with respect to claims submitted to the U.S. Program do so with the authority of Arbitrators under the Federal Arbitration Act and their decision, except as subject to review under the Agreement, are final, binding, and Non-Appealable.

(MSA § 14.1.1)

Both the Drakes and Johnson qualify under this section and are therefore required to submit qualifying disputes to the arbitrators designated under the terms of the MSA. Evidence in the record shows that the Drakes submitted a release of claims and enrolled in the U.S. Program (i.e., the settlement). Accordingly, they qualify as "Enrolled U.S. Program Claimants," as defined by MSA § 1.2.25.2. Similarly, Johnson is an "Enrolling Counsel" under the MSA since that term is defined as "the Primary Law Firm or other Counsel who files an Enrollment Form on behalf of any" claimant. (MSA § 1.2.26)[6] The district court found "[t]he fact that Johnson no longer represented the Drakes at the time they entered into the 2013 Settlement Agreement does not alter the conclusion that Johnson's claim for his alleged lien is governed by the terms of that and subsequent Settlement Agreements. Johnson represents numerous plaintiffs who settled their claims pursuant to one or more of the ASR Settlement Agreements." *Drake* III, 2019 WL 4750608, at *4. Under the terms of the MSA, it is irrelevant that Johnson did not enroll the Drakes in particular. Therefore, Section 14.1 of the MSA establishes that Johnson and the Drakes both agreed "that authority over the process contemplated by the U.S. Program, including any Claims submitted under the U.S. Program, resides with those Persons appointed pursuant to this

---

[6] "Counsel" is defined as "with respect to any particular Person, a lawyer and/or law firm who represents such Person pursuant to a written agreement, or who has an Interest in such Person's Claim Connected with ASR Hip Implants." (MSA § 1.2.19)

Agreement to exercise that authority, as such authority is specified in this Agreement . . . ." (MSA § 14.1.1)

The majority concludes that both the Drakes and Johnson agreed to arbitrate disputes related to the ASR settlement under the terms of the MSA, but only disputes regarding certain ASR hip claims. Specifically, the majority holds that while Johnson agreed to arbitrate disputes relating to claimants he enrolled in the settlement program, by enrolling those clients he did not thereby agree to arbitrate his contingent fee dispute with the Drakes, whom he did not enroll in the settlement or represent subsequent to the approval of the MSA.

That conclusion is irreconcilable with the terms of the agreement. As the majority recognizes, the MSA provides for the arbitration of "any dispute that arises under or otherwise in connection with . . . any U.S. Program claim." (MSA § 14.1.2) Johnson's claim for 35% of the Drakes' settlement clearly qualifies under that expansive language. The Drakes as "Enrolling U.S. Program Claimants" and Johnson as "Enrolling Counsel" "agree[d] that authority over the process contemplated by the U.S. Program . . . . resides with those Persons appointed pursuant" to the MSA "as such authority is specified in" the MSA. (MSA § 14.1.1) That authority over "any dispute that arises under or otherwise in connection with . . . any U.S. Program Claim" encompasses the power to arbitrate the instant dispute. (MSA § 14.1.2) There is nothing in the text of the MSA to support the majority's interpretation that enrollment in the settlement program operates as consent to arbitrate only certain disputes relating to certain settlement claims.

A Texas Court of Appeals decision concerning a fee dispute between an attorney and his former law firm, *Branch Law Firm L.L.P. v. Osborn*, 532 S.W.3d 1, 13–18 (Tex. App. 2016), discussed by the majority is consistent with this analysis. In that case, the court determined the attorney was required to arbitrate according to a master settlement agreement to which he was not

a signatory because he was a "Participating Law Firm," as defined under the applicable agreement. *Id.* at 17–18. The majority incorrectly states that the court's holding depended upon agency principles. While his former law firm made agency-based arguments, the court concluded that the attorney was bound by the agreement to arbitrate because the master settlement agreement's "definition of a Participating Law Firm encompasse[d]" him. *Id.* at 18. Just like the attorney there, Johnson meets the relevant agreement's applicable definition for counsel bound to arbitrate disputes.

Accordingly, there are two contracts that cover Johnson's contingent fee claim: the ARA between the Drakes and Johnson, and the MSA. "In the context of multiple contracts, this court has adopted a more narrow test of arbitrability, examining which agreement, 'determines the scope of' the contested obligations." *Nestle Waters N. Am., Inc. v. Bollman*, 505 F.3d 498, 504 (6th Cir. 2007). The majority did not evaluate this case under *Nestle Waters* because it found there was only one relevant contract, the ARA. Nevertheless, the analysis that it does undertake supports the conclusion that the scope of Johnson's claim is determined by the MSA and therefore must be arbitrated according to its terms. The majority notes "to the extent that Johnson's contingent fee claim may have derived indirect benefits from the MSA, the MSA provided a 'holdback' of 5% of attorney's fees from the settlement award for the common benefit fund." *Ante* at 13 (citing MSA § 4.1.8). This so-called holdback was adopted by the Dallas arbitrator, who, despite recognizing that under the ARA the Drakes agreed to pay a contingent fee of 40%, only awarded Johnson a "net" 35% fee because "the MDL judge assessed a 'common benefit' fee applicable to all claimant attorney fee awards." (Corrected Final Award, R. 10-3, Page ID #260.)

As the district court stated, "[p]ermitting a party to any contract—to say nothing of one governing an area as broad and complex as the area this MDL addresses—to choose which

provisions of that agreement it will abide by, and which it won't, simply is untenable." *Drake* III, 2019 WL 4750608, at *4; *see also Stratton v. Portfolio Recovery Assocs., LLC*, 706 F. App'x 840, 846 (6th Cir. 2017) (recognizing that a party "cannot pick and choose which provisions of [a] contract are enforceable" (citation omitted)). Johnson himself stipulated to the 5% common benefit fee required by the MSA in the Dallas arbitration. This means that the scope of the Drakes' "contested obligations" according to the majority, the Dallas arbitrator, and Johnson himself was determined by the MSA. Accordingly, arbitration of Johnson's contingent fee claim must follow the procedures provided in that agreement under *Nestle Waters*.

There is no suggestion that the Dallas arbitration proceeded according to the terms required by the MSA. The MSA designated three special masters "to oversee the administration of claims for benefits and to make final and binding determinations under this Agreement with the authority of an Arbitrator under the Federal Arbitration Act." (MSA § 12.4.2) None of those so designated were the Dallas arbitrator. "When an arbitrator reaches a question not committed to him by the parties, he acts outside of his authority such that an order vacating such an award is appropriate." *Totes Isotoner Corp. v. Int'l Chem. Workers Union Council/UFCW Local 664C*, 532 F.3d 405, 415 (6th Cir. 2008) (citations omitted); *see also* 9 U.S.C. § 5 ("If in the agreement provision be made for a method of naming or appointing an arbitrator or arbitrators or an umpire, such method shall be followed . . . .").

The district court's refusal to confirm the Dallas arbitration, decision to vacate the same, and order to the parties to adhere to the arbitration procedures set forth in the MSA were correct. Given that Johnson consented to abide by the arbitration provisions in the MSA through his representation of settling DePuy Orthopaedics claimants, I need not address the majority's analysis

relating to direct benefits estoppel or the inherent authority of the district court to manage an MDL before concluding that the district court's orders should be affirmed.

### III.    Conclusion

Because Johnson consented to the arbitration procedures outlined in the  MSA for disputes relating to the ASR hip MDL settlement, I would affirm the orders of the district court refusing to confirm the Dallas arbitration award, vacating the same, and directing the parties to proceed with arbitration pursuant to the MSA. Accordingly, I respectfully dissent.